George A. TRENHOLM, Jr., et al., Appellants,

v.

Raymond F. RATCLIFF, Jr., et al., Appellees.

No. 21049.

Court of Appeals of Texas, Dallas.

May 21, 1982.

Rehearing Denied July 2, 1982.

John M. Gillis, Dallas, for appellants.

Jim K. Choate, Brice & Barron, Dallas, for appellees.

Before AKIN, VANCE and WHITHAM, JJ.

WHITHAM, Justice.

This is an appeal from the second trial of this case. Following the first trial, the court of appeals reversed and remanded so as to allow appellants (Trenholm) to pursue their common law action for fraud and deceit against appellees (Ratcliff) in accordance with the opinion. *Ratcliff v. Trenholm*, 596 S.W.2d 645 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.) At issue, so far as our disposition of the present appeal is concerned, is whether homebuilder Trenholm relied on a representation by developer Ratcliff that a mobile home park near or adjacent to a residential development of custom homes would be moved. After the jury returned answers to special issues, both parties filed motions for judgment on the verdict and Ratcliff in the alternative filed motion for judgment non obstante veredicto. Without specifying the grounds, the trial court granted one of Ratcliff's motions and entered judgment that Trenholm take nothing. For the reasons discussed below, we affirm.

Greenhollow is a residential development of custom homes in West Plano, Collin County, Texas, owned, improved, developed and subdivided for sale of lots to other parties by Richardson Savings and Loan Association. Raymond F. Ratcliff, Jr. was president of Ramahal Development Corporation which had the duty under a joint venture arrangement with Richardson Savings and Loan Association to develop Greenhollow and market those lots to build-

ers with the specific charge to "plan, design and implement sales efforts and procedures...." Oxford Building Systems Inc. is a corporation engaged in the building of custom homes owned by brothers George and Robert Trenholm at the time of the accrual of this cause of action, but wholly owned by George Trenholm at the time of trial. Along with other builders, the Trenholms attended a "draw" breakfast meeting in November, 1975. At that meeting Ratcliff presented himself and the Greenhollow development and invited the attending builders to purchase lots in Greenhollow offering a $500.00 deduction for any lot purchased at that meeting. During the course of the presentation Ratcliff presented a mobile home park located near or adjacent to Greenhollow as a future shopping area. At the conclusion of his planned presentation, Ratcliff invited questions from the builders. George Trenholm asked:

"Ray, you talked in, around and about this mobile home park through your presentation, and you definitely left me with the impression that it's going to be moved, but before I buy any lots I specifically want to know what disposition is going to be made on that property."

Ratcliff answered:

"Don't worry about it, that's zoned commercial, and that property has already been sold. Those people have been notified that their leases will not be renewed, so the park should close up sometime in April. And after that, why, after they get everything moved out over there, they will come in and bulldoze it down so by June or July it will be like there's never been a park there, and that will coincide actually just fine with the grand opening out there."

The mobile home park was not owned by Ratcliff, by Ramahal Development Corporation or by Richardson Savings and Loan Association, but rather by a third party not a party to this action and without any relationship to any party to this action. The mobile home park was not moved by the time houses were completed for sale, and remained in existence, even through trial.

Trenholm built eighteen houses in the Greenhollow Development owned by Richardson Savings and Loan. Six houses were built for its own account and twelve in a joint venture with Richardson Savings and Loan. All were speculative, that is, built without a contract of sale to a purchaser. Ratcliff had no ownership in the development but was to share in the profits with Richardson Savings and Loan, the same as Trenholm was to share in the profits with Richardson Savings and Loan on the twelve houses that he later built in a joint venture with Richardson Savings and Loan. The November, 1975, sales meeting was in the nature of a lot drawing for builders. All of the builders present were previous borrowers from, and doing business with, Richardson Savings and Loan. In addition to the discussion of the mobile home park at the November, 1975, meeting there were statements made by Ratcliff about the future construction of a bridge and of a new elementary school in the area. The two representations about the bridge and school were also alleged to be tainted with fraud, but the jury findings eliminated them from consideration in the present case. Trenholm did not sign up for any lots or purchase any lots during this meeting. Later, however, Trenholm made a deal with Richardson Savings and Loan for six lots and began the construction of his six "spec" houses thereon. Trenholm purchased one of the lots in January 1976, and five more in February, 1976. Shortly thereafter, in April, Richardson Savings and Loan and Trenholm entered into their joint venture arrangement on additional homes to be built in the development. Richardson Savings and Loan would furnish the money and Trenholm would build and sell the houses. The profits or losses would be split 50/50 between them. Twelve joint venture houses were built. On June 23, 1976, a meeting was held by Ratcliff for discussion about the slow sales. Trenholm, along with representatives of Richardson Savings and Loan and some other builders were present. Trenholm brought up the question of the continued presence of the mobile home park. He was told that it would eventually

be sold but for the present there was nothing that could be done about it. Everyone, including Trenholm, agreed on a plan of action, i.e., get some advertising, hold a grand opening, and generate some traffic and sales. This all came to pass. Trenholm sold all of the eighteen houses he completed, six of his own and the twelve joint venture houses. Trenholm settled with Richardson Savings and Loan for $50,000, as his share of the joint venture losses on the twelve joint venture houses.

Among others, the court submitted the following special issue:

Do you find from a preponderance of the evidence that prior to the purchase of Greenhollow lots by Plaintiff Oxford (Trenholm), Raymond F. Ratcliff, Jr. made false representations, either one or more, to representatives of the Plaintiff as to material facts, with the intent of *inducing the Plaintiff to purchase Greenhollow lots*, and *which were relied upon by Plaintiff*? (Emphasis added).

In answering the above special issue, you must confine your deliberations to those representations, if any, regarding removal of the trailer park, completion of the bridge on Alma Road, and construction of the elementary school.

Answer "He did" or "He did not."

The jury's answer was "He did".

In two counterpoints briefed and argued together Ratcliff argues: (1) that the testimony introduced at trial does not support a finding that Trenholm relied upon the alleged misrepresentation because there is no evidence, or alternatively that there is insufficient evidence, to support the jury verdict that Trenholm relied on the alleged representation by Ratcliff; and (2) that in fact the evidence clearly as a matter of law establishes to the contrary, i.e., that Trenholm did not so rely.

At the risk of repetition, some further examination of the evidence is thought necessary in light of Ratcliff's contentions. The two Trenholm brothers went to the November, 1975, meeting "having pretty well resolved ourselves to buying some lots, depending on the terms particularly and what was going to be done with the access to the subdivision." The two Trenholm brothers "were, let's say, eighty percent certain that we would purchase some lots. That was the prime reason for going there. We withheld our final decision until the meeting and what we heard and what was promised what was going to be done on the advertising." At the time they attended this meeting they knew of the existence of the mobile home park and had discussed it prior to the meeting. The brothers did not think the lots were worth the asking price. At some time either before or after the November, 1975, meeting, Trenholm's loan officer at Richardson Savings and Loan Association in effect told the Trenholm brothers that if they wanted any more loans from Richardson Savings and Loan they had better start building in Greenhollow. In March, 1976, Trenholm was approached by Richardson Savings and Loan Association to joint venture with it houses in Greenhollow. In April, 1976, they agreed to the terms of the joint venture. Ultimately the joint venture purchased twelve lots. Of the twelve, the purchases of five of the lots were closed *prior* to June 23, 1976, and the purchases of seven of the lots were closed *after* June 23, 1976. June 23, 1976, was the second meeting of builders with Ratcliff at which it was made known that the mobile home park would not be moved. In their post-submission memorandum brief Trenholm admits that these post-discovery purchases raise the question of reliance on the Ratcliff representation at least as to lots purchased after June 23, 1976, and concedes that there could be no reliance on the alleged misrepresentation as to the purchase of lots after June 23, 1976.

Because we agree that the evidence as a matter of law establishes that Trenholm did not rely on Ratcliff's representation in the purchase of all eighteen lots we dispose of the case on that point and do not reach the no evidence and insufficient evidence contentions of Ratcliff. The undisputed evidence shows that after Trenholm learned on June 23, 1976, that Ratcliff's representation of November, 1975, was false, Trenholm

continued to purchase lots in Greenhollow and construct houses on those lots in a joint venture with Richardson Savings and Loan Association, the owner of the development and the party whose representative (Ratcliff) made the representation. Builder and banker were so closely intertwined in the project that they joint ventured twelve houses; seven of which were purchased after Trenholm admits he knew the alleged representation was false. As pointed out, Trenholm concedes that there could be no reliance on the Ratcliff representation as to the purchases of the seven lots after June 23, 1976. It will be noted that the special issue inquires as to Trenholm's reliance as to the purchase of Greenhollow lots without separating the last seven purchased after June 23, 1976, from those purchased before that date. We hold as a matter of law that if Trenholm did not rely on Ratcliff's representation in the purchase of lots twelve through eighteen, then Trenholm also did not rely on Ratcliff's representation in the purchase of lots one through eleven.

In an effort to avoid this obvious consequence of purchasing the last seven lots, Trenholm further contends in their postsubmission brief that all eighteen lots are to be considered as a "total building program" entered into in reliance on Ratcliff's representation. We understand Trenholm's position to be that the purchases of lots are to be considered a "total building program" and a proper finding of reliance as to any lot is a finding of reliance as to the remaining lots under the special issue. We do not agree. The converse is true. If admittedly there was no reliance as to lots twelve through eighteen, then under the "total building program" there was no reliance as to lots one through eleven as a matter of law under the special issue as submitted. The issue submitted is Trenholm's issue. Trenholm did not object to this special issue number one. Under the issue as submitted Trenholm was required to obtain a finding of reliance as to all of the lots purchased. The charge of the court by special issues does not break the reliance fact down by lots or groups of lots. Trenholm admits that the jury finding cannot be applicable as to all of the lots.

That special issue number one is to be interpreted as applying to all eighteen lots is supported by the manner in which the issue of damages was submitted to the jury. The court submitted, and the jury answered, special issue number six as follows:

What sum of money, if any, do you find from a preponderance of the evidence would reasonably compensate Plaintiff Oxford (Trenholm) for damages, if any, directly and naturally resulting from the reliance upon the false representations of Raymond F. Ratcliff, Jr., if any?

Answer separately in dollars and cents, if any, with respect to each of the following elements:

| | | ANSWER |
|---|---|---|
| (a) | Out-of-pocket losses on construction of the 12 joint venture houses | 68,750.00 |
| (b) | Out-of-pocket losses on construction of the 6 Oxford houses | 46,750.00 |
| (c) | Loss of anticipated net profit on construction of the 12 joint venture houses | 37,500.00 |
| (d) | Loss of anticipated net profit on construction of the 6 Oxford houses | 37,500.00 |

Thus, it will be seen that the only breakdown between lots is between the Trenholm six single venture houses and the twelve joint venture houses. There was no effort to separate the pre-discovery lots one through eleven from the post-discovery lots twelve through eighteen. Nor was there any effort to determine damages on the basis of each of the eighteen houses individually. The damage issue was submitted in accordance with Trenholm's "total building program" theory. If damages "directly and naturally resulting from reliance upon the false representations" of Ratcliff are to be determined on the basis of all eighteen houses, then the inquiry in special issue number one must be read as applying to all eighteen lots. Trenholm did not object to special issue number six.

We conclude that the jury's answer that Trenholm relied on Ratcliff's representation should be disregarded. Accordingly, the trial court correctly entered judgment that Trenholm take nothing.

Affirmed.