**BANK OF TEXAS, N.A., Appellant,**

v.

**Michael L. GAUBERT, Appellee.**

No. 05–08–01080–CV.

Court of Appeals of Texas, Dallas.

May 8, 2009.

**548**

David M. Odens, Dallas, for Appellant.

Deborah G. Hankinson, Hankinson Levinder LLP, Dallas, for Appellee.

Before Justices MORRIS, WRIGHT, and MOSELEY.

## OPINION

Opinion by Justice MOSELEY.

This is an interlocutory appeal from a temporary injunction. The trial court enjoined Bank of Texas, N.A. from foreclosing on real property owned (at least in part) by Michael L. Gaubert at a sale scheduled for August 5, 2008 and from reposting the property for foreclosure until after a trial on the merits. In a single issue, the Bank contends the trial court abused its discretion by granting the temporary injunction because the alleged oral agreement to extend the loan for four months is barred by the statute of frauds applicable to loans in excess of $50,000. *See* TEX. BUS. & COM. CODE ANN. § 26.02 (Vernon 2002).

We conclude the trial court abused its discretion by concluding Gaubert showed a probable right to recovery justifying injunctive relief beyond August 2008. Ac-

cordingly, we vacate the trial court's temporary injunction.

## BACKGROUND

In July 2007, Gaubert (an attorney) and Khaled Chami (a home builder) signed as co-borrowers and delivered to the Bank a promissory note evidencing a $3.9 million loan. The loan, which required monthly interest payments, was a short-term bridge loan that matured by its terms on January 3, 2008. The obligations under the note were joint and several.[1] The note was secured by a deed of trust on non-homestead property owned by Gaubert and Chami.[2] The note, deed of trust, and other loan documents contain no provisions for automatic renewal of the loan at maturity or for capitalizing or "rolling-in" the accrued interest or any unpaid property taxes.

The loan documents include a notice of final agreement, signed by Gaubert, Chami, and the Bank, as required by TEX. BUS. & COM. CODE ANN. § 26.02(e), stating: "The written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties."

Gaubert and Chami used Chip Ferrier as a loan broker for the loan. Ferrier also worked with them to obtain permanent financing for the property. Many of the communications between Gaubert and the Bank before and after the loan matured were through Ferrier. Gaubert said Ferrier was working on behalf of both Gau-

---

1. Gaubert said he signed the promissory note and took a fifty-percent interest in the house. The terms of the note do not limit the liability of either Gaubert or Chami for the debt.

2. The property is a "spec house," built on a speculative basis without a contract from a

specific buyer. *See Tex. Wood Mill Cabinets, Inc. v. Butter,* 117 S.W.3d 98, 103 (Tex.App.-Tyler 2003, no pet.); *Trenholm v. Ratcliff,* 636 S.W.2d 718, 719 (Tex.App.-Dallas 1982), *rev'd,* 646 S.W.2d 927 (Tex.1983).

bert and the Bank for the original loan, during negotiations, when the loan matured, and thereafter. It appears Ferrier acted as an intermediary or "go-between" for both parties.[3]

The parties anticipated Gaubert would obtain permanent financing from another lender and repay the Bank when the loan matured. However, Gaubert testified that when he entered into the loan, he was told by the Bank officer there would not be a problem extending the loan if it matured.

When the note matured on January 3, 2008, Gaubert had not obtained permanent financing. He testified the Bank told him several times by telephone, e-mail, and letters, that the loan was being extended.

The Bank contacted the borrowers (or Ferrier) in early January and discussed extending the loan, but needed updated financial statements from Gaubert and Chami. Gaubert said the Bank at some point asked for financial statements, but never told him it was a condition for extending the loan. Gaubert sent an e-mail to Ferrier on January 28 discussing the problems with obtaining permanent financing and mentioning the need to extend the Bank loan and roll-in the taxes and an outstanding second lien debt. Ferrier forwarded this e-mail to the Bank the same day.

On February 1, Ferrier sent an e-mail to a senior vice president of the Bank, Jennifer Normile, stating that Gaubert was bringing a $30,000 interest payment. Gaubert testified he was on his way to deliver the $30,000 interest payment on February 1, but someone at the Bank spoke to him by telephone and told him the payment did not need to be made because the loan was being extended. Gaubert did not make the interest payment.

On February 21, 2008, Normile sent Gaubert a letter confirming that the loan "is in the process of being extended and renewed for an additional four months." The letter said Normile had requested the loan be removed from reporting to credit bureaus until she gathered the required information needed to extend the loan.

On March 6, Gaubert e-mailed Ferrier and Normile saying he was getting updated financial statements from Chami as this was "the last item needed to extend the Bank of Texas loan." Gaubert's e-mail also said he had just learned his credit report showed a 30-day late payment on the loan. He asked the Bank for a letter advising that this report was a mistake and asked the Bank to have the report removed. Later that day, the Bank sent a letter addressed to Gaubert, Chami, and "To whom it may concern" confirming that the loan "which matured on January 3, 2008 is in the process of being extended for an additional four months." The letter also said the Bank was in the process of gathering required information to extend the loan and that the borrower "has been current on all mortgage payments and the recently reported late payment was due to a bank error. The loan payment is not late as the borrower is waiting on the bank to renew the loan." Gaubert testified the state of his credit was good to excellent before this, but it changed in January, February, and March 2008 because the Bank reported him as late in making payments on the loan.

---

**3.** *See Gaines v. Kelly,* 235 S.W.3d 179, 183 (Tex.2007); *Rauscher Pierce Refsnes, Inc. v. Great Sw. Sav., F.A.,* 923 S.W.2d 112, 116 (Tex.App.-Houston [14th Dist.] 1996, no writ) (where a broker acts as a "matchmaker" that brings parties together for the purpose of negotiating, he is not an agent of either party); *Chien v. Chen,* 759 S.W.2d 484, 495 n. 7 (Tex.App.-Austin 1988, no writ) (where a broker deals with both parties at arm's length, he is a "middleman" and not an agent of either party).

On March 18, Normile sent Gaubert an e-mail saying she "almost [had] the extension approved" to renew the loan until May 3rd, but if the permanent financing failed again, the Bank would require a substantial principal reduction in order to do another renewal. Gaubert replied that he would get back to her, and that he "thought the loan was being extended 120 days from now (not the original maturity date)." The e-mail correspondence during this time indicates Gaubert and Ferrier were working on obtaining a commitment from a permanent lender to refinance the debt and Normile was asking for information on when Gaubert would have additional funds available in connection with the approval of the permanent financing. She responded to Gaubert that when she had the information, "we can date the extension accordingly."

Sometime in early April, the Bank delivered to Ferrier draft loan documents; if executed, those documents would have extended the note and deed of trust to July 3, 2008. In an April 1 e-mail to Ferrier, the Bank requested an interest payment of over $109,000 to bring the loan current. Ferrier responded that Gaubert wanted to roll the interest into the extended loan. Gaubert testified he never saw the proposed loan extension documents, but discussed them with Ferrier. Gaubert asked Ferrier if the extended loan "rolled-in" the property taxes and accrued interest and Ferrier said they did not because the Bank and Normile wanted to get the extension in place first, then it would be easier to go back and roll-in the taxes and interest. In addition, Gaubert testified he and Chami wanted the loan put in the name of an entity and they would also sign personally. He testified he wanted to avoid the problem of being personally liable on a $3.9 million loan when he was only a fifty percent owner of the property. Gaubert told Ferrier, "I want the extension, but I want it to be in a corporate name with me as an individual guarantor, and I need[ ] the property taxes and the interest rolled into the loan." Gaubert testified he did not consider this a counteroffer because he had "from the beginning told Bank of Texas and Chip [Ferrier] that I needed the property taxes and the interest rolled in." Gaubert never signed or returned the proposed loan documents.

Gaubert testified that the four-month extension was to run from the time new loan documents were signed. Referring to the February 21 letter stating the Bank was in the process of renewing the loan for an additional four months, Gaubert testified, "It meant when the loan papers were done we would have a four month extension. If they were done the next day, it would be four months. If it was done the next month, it would be four months from the next month. They were going to give us four months." He also testified, "Based on the representations of the bank and the letters I thought, we had four months from when the extension papers were going to be signed. Four months from March is July." Finally, Gaubert testified he was still communicating with the Bank in early April about extending the loan, and if he had renewed the loan for four months in April, the loan would have been due in August.

In late April, however, the Bank told Gaubert it no longer intended to extend the loan agreement. Shortly thereafter—but still in April—Gaubert met with the Bank and others at the property. In his brief, Gaubert says that at this meeting the Bank made statements that led him to believe the Bank *was* honoring its agreement to extend the loan to allow him additional time to market and sell the house. He testified that a proposal came out of the meeting to take care of the property taxes, make a $40,000 interest payment,

and do additional work on the house by August 1, and "in return for that we wanted them [the Bank] to not post the property for foreclosure in July." Gaubert also discussed his selection of a realtor to sell the property and said the Bank representatives were in agreement with the selection.

Gaubert testified the Bank continued to ask him to make a proposal and, by the middle of June, Gaubert had a lender willing to fund a significant amount to pay the accrued interest and to "take care of some other issues." The Bank, however, posted the property for foreclosure on the first Tuesday in July. On the Friday before the scheduled July 1 foreclosure sale, Gaubert discussed his proposal with the Bank, but the Bank refused and said it would go forward with foreclosure.

Gaubert filed this lawsuit on June 30, 2008, and obtained a temporary restraining order stopping the foreclosure. Gaubert's petition requested temporary and permanent injunctions preventing the Bank from foreclosing on the property and posting it for foreclosure on August 4, 2008. Gaubert asserted a claim for actual damages for negligent misrepresentation and requested a declaratory judgment that the Bank had agreed to extend the loan and that the market value of the property exceeded the loan balance by more than $1 million. Gaubert later amended his petition to add claims for breach of contract, violations of the Texas Deceptive Trade Practices Act, tortious interference with prospective business relations, promissory estoppel, and allegations of a "joint enterprise."[4] The Bank filed an answer raising the statute of frauds as a defense to Gaubert's claims. Chami intervened in the

trial court, but is not a party to this appeal.

After a July hearing, the trial court signed a temporary injunction on August 1 finding Gaubert had demonstrated a probable right to the relief he sought on one or more of his causes of action and shown a probable, irreparable, and imminent injury in the interim. In the temporary injunction, the trial court found that: the property was unique; Gaubert would lose substantial equity in the property; foreclosure would substantially harm Gaubert's credit rating, reputation, and ability to conduct his law practice; and that he had no adequate remedy at law. The temporary injunction enjoined the Bank from foreclosing on the property, including the scheduled sale for August 5, 2008, and from posting the property for foreclosure until final trial on the merits, which was set for February 2, 2009. (At oral argument, the parties indicated the case was not reached at the February 2, 2009 docket and would be reset for a later date.)

The Bank filed this interlocutory appeal from the temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon 2008).

## STANDARD OF REVIEW

▇▇▇ A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). Its purpose is to preserve the status quo of the subject matter of the litigation until trial on the merits. *Id.* To obtain a temporary injunction, the applicant must plead and prove: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, immi-

---

**4.** These causes of action are based on the same factual allegations as Gaubert's other claims and do not present an independent basis for injunctive relief. Gaubert does not

argue the record shows a probable right to recovery and probable irreparable injury on these causes of action.

nent, and irreparable injury in the interim." *Id.* "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Id.* Therefore, as a general rule, "a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available." *Id.* at 211. The applicant is not required to show he will prevail at a final trial; "he needs only to plead a cause of action and to show a probable right on final trial to the relief he seeks and probable injury in the interim." *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex.1968) (when only relief sought on final trial is injunctive applicant must show a probable right on final hearing to a permanent injunction). In other words, "the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits." *Walling v. Metcalfe,* 863 S.W.2d 56, 57–58 (Tex.1993) (citing *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981)).

We review the granting or denial of a temporary injunction for an abuse of discretion. *Butnaru,* 84 S.W.3d at 204; *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 883 (Tex.App.-Dallas 2003, no pet.). "A trial court abuses its discretion in granting an injunction when it misapplies the law to established facts or when the evidence does not reasonably support the determination of the existence of a probable right of recovery or probable injury." *Bureaucracy Online, Inc. v. Schiller,* 145 S.W.3d 826, 829 (Tex.App.-Dallas, 2004, no pet.). We do not substitute our judgment for that of the trial court, but determine only whether the trial court's action was so arbitrary as to exceed the bounds of reasonable discretion. *Butnaru,* 84 S.W.3d at 204; *Tom James,* 109 S.W.3d at 883. We draw all legitimate inferences from the evidence in the light most favorable to the trial court's order. *Tom James,* 109 S.W.3d at 883.

■ Additionally, granting an injunction in the face of an adequate remedy at law is an abuse of discretion. *Harris County v. Gordon,* 616 S.W.2d 167, 168, 170 (Tex. 1981); *Alert Synteks, Inc. v. Jerry Spencer, L.P.,* 151 S.W.3d 246, 254 (Tex.App.-Tyler 2004, no pet.); *see also Rogers v. Daniel Oil & Royalty Co.,* 130 Tex. 386, 110 S.W.2d 891, 894 (1937) (stating that when "an adequate and complete remedy at law is provided, our courts, though clothed with equitable jurisdiction, will not grant equitable relief").

On interlocutory appeal of an order granting a temporary injunction, we do not reach the merits of the dispute, but determine only whether the record supports the trial court's exercise of discretion. *See Tom James,* 109 S.W.3d at 884. Thus, we do not decide the ultimate merits of Gaubert's claims or the Bank's defenses; we determine only whether Gaubert has shown a probable right to relief on his claims in light of the statute of frauds defense and a probable, imminent, and irreparable injury justifying the trial court's temporary injunction, such that he is entitled to preservation of the status quo pending trial on the merits.

## DISCUSSION

■ In the Bank's first issue, it contends the trial court erred in issuing the temporary injunction because the statute of frauds bars all of Gaubert's causes of action. The purpose of the statute of frauds is to prevent fraud and perjury in certain types of transactions by requiring certain agreements to be in writing and signed by the parties to be enforceable.

*See Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex.2001).

## A. Traditional Statute of Frauds and Its Exceptions

■ The traditional statute of frauds in Texas, currently at TEX. BUS. & COM. CODE ANN. § 26.01(a) (Vernon Pamph. 2008), provides that certain types of agreements, such as a promise to answer for the debt, default, or miscarriage of another, a contract for the sale of real estate, or an agreement which is not to be performed within one year of its making, are not enforceable unless the agreement, or a memorandum of it, is in writing and signed by the person to be charged or his authorized representative.[5] However, equity will act to avoid the statute of frauds in circumstances where enforcing the statute would itself amount to a fraud. *See Nagle v. Nagle*, 633 S.W.2d 796, 799–800 (Tex. 1982); *Birenbaum v. Option Care, Inc.*, 971 S.W.2d 497, 503 (Tex.App.-Dallas 1997, pet. denied) ("Before using equity to circumvent the statute of frauds, the Texas Supreme Court has consistently required a showing that fraud would result in not doing so."). Those circumstances are limited, however, because otherwise the exceptions would render the statute meaningless:

The Statute of Frauds is the Legislature's directive that courts enforce promises covered by the statute only if such promises are in writing. Equity can avoid the strictures of that directive only by "some positive rule which will insure its exercise for ... the prevention of an actual fraud as distinguished from a mere wrong ... so surely as to leave the statute itself, through the exactness of the exception, with some definiteness of operation."

*Nagle*, 633 S.W.2d at 799 (quoting *Hooks v. Bridgewater*, 111 Tex. 122, 128, 229 S.W. 1114, 1116 (1921)).

■ Promissory estoppel and partial performance have been recognized as equity-based exceptions to the traditional statute of frauds. Promissory estoppel allows enforcement of an otherwise unenforceable oral agreement when (1) the promisor makes a promise that he should have expected would lead the promissee to some definite and substantial injury; (2) such an injury occurred; and (3) the court must enforce the promise to avoid the injury. *Nagle*, 633 S.W.2d at 800; *Moore Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936 (Tex.1972). Promissory estoppel avoids the traditional statute of frauds when the alleged oral promise is to sign an *existing* document that satisfies the statute of frauds. *See Nagle*, 633 S.W.2d at

5. This traditional statute of frauds applies to:

 (1) a promise by an executor or administrator to answer out of his own estate for any debt or damage due from his testator or intestate;

 (2) a promise by one person to answer for the debt, default, or miscarriage of another person;

 (3) an agreement made on consideration of marriage or on consideration of nonmarital conjugal cohabitation;

 (4) a contract for the sale of real estate;

 (5) a lease of real estate for a term longer than one year;

 (6) an agreement which is not to be performed within one year from the date of making the agreement;

 (7) a promise or agreement to pay a commission for the sale or purchase of:

 (A) an oil or gas mining lease;

 (B) an oil or gas royalty;

 (C) minerals; or

 (D) a mineral interest; and

 (8) an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 74.001, Civil Practice and Remedies Code. This section shall not apply to pharmacists.

TEX BUS. & COM. CODE ANN. § 26.01(b).

800 (discussing contract for sale of real estate provision of section 26.01); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied) (same); *see also Birenbaum*, 971 S.W.2d at 504 (promissory estoppel avoids statute of frauds only if oral promise "was to execute a document in existence that *itself* complied with the statute"; discussing statute of frauds formerly applicable to purchase of securities).

 Under the partial performance equitable exception, an oral agreement that does not satisfy the traditional statute of frauds but that has been partially performed may be enforced if denying enforcement would itself amount to a fraud. *Breezevale*, 82 S.W.3d at 439; *Carmack v. Beltway Dev. Co.*, 701 S.W.2d 37, 40 (Tex. App.-Dallas 1985, no writ) (discussing statute of frauds for agreements to pay a commission on sale or lease of real estate). The actions asserted to constitute partial performance must be "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement; they "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff." *Breezevale*, 82 S.W.3d at 439–40.

## B. The Statute of Frauds Relating to Loan Agreements—Section 26.02

 In 1989, the legislature enacted section 26.02—a specific statute of frauds for loan agreements involving loans exceeding $50,000. *See* Tex. Bus. & Com. Code Ann. § 26.02. Under this statute, a loan agreement is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative. *Id.* § 26.02(b). Section 26.02 defines "loan agreement" broadly. Subject to exceptions not applicable here, a "loan agreement"

> means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation. ·

*Id.* § 26.02(a)(2). Unlike the traditional statute of frauds (section 26.01), section 26.02 requires the loan agreement itself to be in writing; a memorandum of the agreement does not satisfy section 26.02. *Cf. id.* §§ 26.01(a) (agreement unenforceable unless promise or agreement, or a memorandum of it, is in writing and signed), 26.02(b) (agreement unenforceable unless the agreement is in writing and signed).[6]

No case has expressly held that the equitable exceptions to the traditional statute of frauds also apply to section 26.02. Cases discussing promissory estoppel in the context of section 26.02 concluded that, assuming the exception applied, the evidence did not raise an issue of fact as to the existence of one or more of its elements. *See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex.App.-Hous. [14th Dist.]

---

**6.** This difference in language may not be of large practical effect because of the completeness of the memorandum required to satisfy the traditional statute of frauds. *See Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex.1978) (statute of frauds requires "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony.").

2005, pet. denied) (concluding promissory estoppel exception was not shown in connection with alleged oral loan agreement because of no evidence of a promise to sign a written document satisfying statute of frauds); *Maginn v. Norwest Mortg., Inc.,* 919 S.W.2d 164, 168 (Tex.App.-Austin 1996, no writ) (same). Similarly, the only case discussing partial performance in the context of section 26.02 concluded the evidence did not raise a fact issue on that exception. *See Barnett v. Legacy Bank of Texas,* 2003 WL 22358578 (Tex.App.-Eastland Oct. 16, 2003, pet. denied) (mem. op.).

As set forth herein, we need not decide what equitable exceptions—if any—apply to avoid section 26.02. Rather, like the opinions in *1001 McKinney Ltd., Maginn,* and *Barnett,* for purposes of this appeal we will assume in our analysis that the traditional exceptions to section 26.01 also apply to section 26.02.

## C. Application of the Statute of Frauds

Based on the record, it is undisputed that the loan involved in this case—as well as any relevant loan agreements—fall within the scope of section 26.02. *See* Tex. Bus. & Com. Code Ann. § 26.02(a)(2), (b). Thus, if any such agreement is to be enforced, it must either be in writing and signed by the Bank, or an exception to the statute of frauds must apply.

Gaubert asserts the Bank violated one or more oral agreements to extend the loan for four months.[7] As such extension agreements ordinarily are unenforceable under section 26.02, Gaubert asserts: (1) both the promissory estoppel and part performance equitable exceptions to the statute of frauds apply to section 26.02; (2) he presented evidence raising these defenses here; and thus (3) the trial court did not

abuse its discretion in concluding that he showed a probable right to recovery on the merits.

■ Viewing the record—including Gaubert's testimony that he was still discussing the extension with the Bank in early April—in the light most favorable to the trial court's ruling, the record before us does not contain evidence giving rise to the promissory estoppel exception. There is no evidence the Bank promised to sign an existing writing satisfying the statute of frauds. *See Birenbaum,* 971 S.W.2d at 504. Gaubert never testified the Bank promised it would sign an existing writing extending the loan for four months; rather, his testimony was there was an oral agreement to extend the loan for four months *from the time when new documents were signed.* And with respect to the April draft loan extension documents, which would have extended the loan to July 3, 2008, the evidence is undisputed that it was Gaubert, not the Bank, who refused to sign.

■ The partial performance exception is also not supported by the record. Gaubert testified he partially performed an oral agreement regarding a loan extension by retaining the preferred real estate agent to market the house, finishing the house and pool, redoing the landscaping, and paying the utilities and insurance at a cost of $6,000 to $8,000 per month. These actions were taken—by Gaubert's own testimony—*after* the Bank told him in late April it was not going to extend the loan; thus they could not have been taken in reliance on any earlier oral agreement to extend the loan. *See Breezevale Ltd.,* 82 S.W.3d at 439. Further, if Gaubert's actions were necessarily referable to and in

---

7. Gaubert does not argue on appeal the letters signed by the Bank regarding the exten-

sion satisfy section 26.02.

partial performance of an oral agreement following the late April meeting at the house, that agreement was at most (as Gaubert testified) an agreement "to not post the property for foreclosure in July." Thus the evidence proffered in connection with Gaubert's partial performance argument does not show a probable right of recovery on the merits supporting injunctive relief beyond that time period.

Thus we conclude the evidence does not reasonably support the determination of the existence of a probable right of recovery based on breach of any loan extension agreement such as would justify injunctive relief. *See Bureaucracy Online, Inc.*, 145 S.W.3d at 829; *Harris County*, 616 S.W.2d at 170.

## D. Oral Modification of Contract within the Statute of Frauds

Gaubert's brief also argues that the temporary injunction can be supported on the theory of oral modification of the original loan agreement. He asserts that despite the statute of frauds, "an oral extension of time for performance ... is permitted so long as the oral agreement is made before the time limit to be extended has passed and the oral agreement does not materially alter the underlying written contract." In support for this argument, Gaubert cites *Triton Commercial Properties, Ltd. v. Norwest Bank Texas, N.A.*, 1 S.W.3d 814, 818 (Tex.App.-Corpus Christi 1999, pet. denied).

*Triton* involved section 26.01, the statute of frauds applicable to contracts for the sale of land (in that case, an option to purchase). *Id.* However, the statute of frauds applicable here—section 26.02—is more exacting; it requires any loan agreement by a financial institution, including an agreement to "delay repayment of money," is unenforceable unless it is in writing and signed by the party to be bound. Tex.

Bus. & Com. Code Ann. § 26.02(a)(2), (b). Thus, in the context of section 26.02, we reject Gaubert's oral modification argument.

## E. Negligent Misrepresentation

Gaubert also argues his negligent misrepresentation claim alone is enough to support the temporary injunction. We disagree. While equity will avoid the statute of frauds where application of the statute would itself work a fraud, there is no authority for avoiding the statute of frauds based on mere negligence. *See Birenbaum*, 971 S.W.2d at 503–04. *See also Nagle*, 633 S.W.2d at 799 (promissory estoppel circumvents the statute of frauds in the limited circumstance when it is necessary to prevent "an actual fraud as distinguished from a mere wrong.") (quoting *Hooks*, 111 Tex. at 128, 229 S.W. at 1116).

A negligent misrepresentation claim may not fall within the statute if the premise of the claim is that, although an agreement was never made, the defendant negligently misrepresented that an agreement had been made and the plaintiff reasonably relied on that misrepresentation to its detriment. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991) ("The Sloanes do not claim that the bank agreed to loan them money and then breached that agreement; rather, they claim that the bank did not agree to loan them money, yet negligently misrepresented that it had made such an agreement."). But recovery under this theory is also limited to the pecuniary loss suffered in reasonable reliance on the misrepresentation; lost profits or the benefit of the bargain are not recoverable. *Id.* at 443. We focus on the true nature of the dispute to determine the legal treatment of claims, "rather than allow artful pleading to morph contract claims into fraud causes of action to gain favorable redress under the

law." *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007) (per curiam). While a claim for out-of-pocket damages may not be barred by the statute of frauds, to the extent a claim attempts to enforce the benefit of the unwritten promise—whether couched in terms of contract, tort, or negligent misrepresentation—it is barred.

Here, based in part on his negligent misrepresentation claim and in addition to his out-of-pocket damages, Gaubert sought the relief of a temporary injunction. That relief has the effect of enforcing the alleged unwritten promise to extend the loan, giving Gaubert the benefit of his alleged oral agreement in violation of the statute of frauds.[8] Regardless of any other remedies Gaubert may have for negligent misrepresentation, the relief at issue in this appeal—the temporary injunction—if countenanced, allows Gaubert to do indirectly what he cannot do directly, i.e. enforce an oral agreement within the ambit of section 26.02.

Gaubert also argues the threat of damage to his credit reputation and resulting damage to his personal and business affairs is the type of harm warranting injunctive relief. However, the possibility of non-benefit-of-the-bargain damages does not change the fact that the temporary injunction gives Gaubert the benefit of the alleged bargain to extend the loan. Further, damage to credit reputation would likely result from every foreclosure; if damage to credit reputation alone warrants a temporary injunction against foreclosure, foreclosures will always be temporarily enjoined.

Gaubert cites *Home Savings of America, F.A. v. Van Cleave Development Co., Inc.,* 737 S.W.2d 58, 59 (Tex.App.-San Antonio 1987, no writ) and *Guardian Savings and Loan Association v. Williams,* 731 S.W.2d 107, 108–09 (Tex.App.-Houston [1st Dist.] 1987, no writ). These cases were decided before enactment of section 26.02 and do not discuss the application of any statute of frauds. Neither opinion specifically identifies the causes of action that were asserted against the lenders, and the discussion of injury to credit reputation in both opinions was in connection with whether the record showed an irreparable injury, not in connection with the probable right to recovery requirement. *See Home Savings,* 737 S.W.2d at 60;[9] *Guardian Savings,* 731 S.W.2d at 109.[10] These opinions do not stand for the proposition that regardless of the cause of action and validity of the debt, potential damage to the debtor's credit reputation justifies a temporary injunction preventing foreclosure pending trial.

8. Indeed, as discussed above, the temporary injunction gives Gaubert more than the benefit of his alleged unwritten bargain, as it enjoins the Bank from foreclosing in August of 2008 and thereafter until trial.

9. The claim in *Home Savings* was based on the lender's breach of a series of agreements to reinstate the loan which made it impossible for the developer to salvage the loan through a completed arrangement to transfer the property into a limited partnership. *Home Savings,* 737 S.W.2d at 60. The court concluded based on conflicting testimony there was evidence of a probable right of recovery and no abuse of discretion by the trial court. *Id.* The opinion does not discuss whether the agreements were in writing or the applicability of the statute of frauds.

10. Apparently, *Guardian Savings* was based on a usury claim because the court noted undisputed evidence that the calculated interest rate was more than the maximum amount allowed by law. *Guardian Savings,* 731 S.W.2d at 109. The lender had approached the developer, proposed a joint venture, and assured the developer it would "carry" the loans until profits could be generated. *Id.*

We have said that where there is a substantial claim for usury, where the borrower could elect to apply the usury penalties to reduce or extinguish the indebtedness and save the property from foreclosure, "the trial judge has discretion to preserve the status quo until the net amount of the indebtedness can be determined at a trial on the merits." *Irving Bank & Trust Co. v. Second Land Corp.*, 544 S.W.2d 684, 688 (Tex.Civ.App.-Dallas 1976, writ ref'd n.r.e.). Unlike usury, Gaubert's negligent misrepresentation claims do not tend to destroy or defeat the debt. Nor is there any evidence the Bank might be unable to respond in damages on his negligent misrepresentation claims if he succeeds on the merits. *See Walling*, 863 S.W.2d at 58 ("Although it is unusual, circumstances can arise in which a temporary injunction is appropriate to preserve the status quo pending an award of damages at trial.").

While a claim for damages can be sufficient to support a temporary injunction, "[d]amages are usually an adequate remedy at law, and the requirement of demonstrating an interim injury is not to be taken lightly." *Walling*, 863 S.W.2d at 57. A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru*, 84 S.W.3d at 204. "An applicant for a temporary injunction seeks extraordinary equitable relief. He seeks to immobilize the defendant from a course of conduct which it may well be his legal right to pursue." *Camp v. Shannon*, 162 Tex. 515, 519, 348 S.W.2d 517, 519 (1961). Under the facts of this case, Gaubert's claim for recovery of damages on his negligent misrepresentation claim does not warrant the extraordinary relief of a temporary injunction.

We conclude the statute of frauds serves a vital and important function and allegations of mere negligence are not sufficient to avoid its effect. *Nagle*, 633 S.W.2d at 799. As said in *Haase*, "[i]f in the face of the Statute of Frauds we permit [Gaubert's negligent misrepresentation] claim to the extent he seeks to recover the benefit of the unenforceable bargain [a four-month extension of the loan], we deprive the Statute of any effect." *See Haase*, 62 S.W.3d at 799.

### Conclusion

We conclude the trial court abused its discretion in concluding that Gaubert showed a probable right to relief entitling him to a temporary injunction against foreclosure of the deed of trust lien beyond the date of the alleged extension agreement. We sustain the Bank's issue. We reverse the trial court's order and vacate the temporary injunction.