ACCEPTED
15-25-00020-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 8:55 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00020-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 8:55:39 PM
CHRISTOPHER A. PRINE
Clerk

IN THE FIFTEENTH COURT OF APPEALS

Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink
Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and
Property First Group, LP,

*Appellants,*

v.

SafeLease Insurance Services, LLC,

*Appellee.*

On Appeal from the Third Division of the Texas Business Court
Cause No. 25-BC03A-0001

## APPELLANTS' REPLY BRIEF

GREENBERG TRAURIG, LLP

Dale Wainwright
State Bar No. 00000049
Dale.Wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
Justin.Bernstein@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

COUNSEL FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

# TERMS AND PARTY REFERENCES

| | |
|---|---|
| API | Application Programming Interface, a type of software intermediary that facilitates coordination between software owned by different parties |
| FMS | Facility management software, which is used by operators of self-storage facilities to manage those facilities. The three Storable FMS are storEDGE, SiteLink, and Easy Storage Solutions |
| Remand Denial | The business court's February 10, 2025 Opinion and Order denying Defendants' motion to remand. CR747–755. *SafeLease Ins. Services LLC v. Storable, Inc.*, No. 25-BC03A-0001, 2025 WL 446343 (Tex. Bus. Ct. Feb. 10, 2025) |
| Risk-management product | This collectively refers to two risk-shifting products at issue in this appeal: tenant insurance and tenant protection plans |
| SafeLease | Plaintiff/Appellee SafeLease Insurance Services, LLC |
| Storable | Defendants/Appellants Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP |
| Temporary Injunction or Injunction | The Amended Order Granting Temporary Injunction, signed March 11, 2025. 1SuppCR40–48 |
| Terms of Use | The agreements governing use of Storable's FMS. Each of Storable's FMS has its own similar agreement, which is titled either Terms of Use or Terms of Service. BC7RR1264, DX-1; BC7RR1273, DX-2; BC7RR1291, DX-3 |
| §25A.006 | TEX. GOV'T CODE §25A.006, which is the statute governing removal to the Texas Business Court. |

# TABLE OF CONTENTS

*Page*

TERMS AND PARTY REFERENCES ....................................................... ii

TABLE OF CONTENTS ........................................................................ iii

INDEX OF AUTHORITIES ......................................................................v

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ..........................................................................................3

I.    SafeLease Untimely Removed To The Business Court. ...........................3

    A.    SafeLease's "plain language" argument rewrites the statutory text. .................................................................3

    B.    A plaintiff discovered before filing its petition "facts establishing the business court's jurisdiction over the action." ..............................................................................4

    C.    SafeLease's policy arguments ignore the option it had to initially file in the business court. ...............................6

    D.    SafeLease engaged in impermissible forum shopping. ................8

II.    This Court Has Jurisdiction To Review Whether The Business Court Should Have Remanded Before Granting The Temporary Injunction. ........................................................11

    A.    Authority for an interlocutory appeal of the Temporary Injunction encompasses review of the Remand Denial. ..............11

    B.    In the alternative, this Court can treat this appeal as a request for mandamus relief. ......................................................13

III.    SafeLease Failed To Establish The Requirements For A Temporary Injunction. ..........................................................................14

    A.    SafeLease failed to show an injury that is probable, imminent, and irreparable. ..........................................................14

        1.    SafeLease provided no evidence that it could not avoid the alleged injuries by incurring the cost for an API agreement. ..................................................14

        2.    SafeLease provided no evidence that any irreparable harm was imminent. ..........................................................16

3. SafeLease does not deny that it can track lost customers and revenue..........................................17

4. The business court's findings are unsupported by evidence. .........................................................18

B. SafeLease failed to show a probable right to recover for tortious interference..................................................20

1. Affirmative defenses are considered when determining probable right to recover.............................21

2. Storable's justification defense bars SafeLease's right to recovery. ...............................................23

a. Charging for access to property and enforcing contracts are not "tortious in themselves."..............23

b. The Terms of Use justify interfering with third parties profiting from Storable's FMS. ....................25

c. The Terms of Use justify preventing access that interferes with FMS integrity or performance..................................................27

d. The Terms of Use justify preventing circumvention of security measures. ........................29

e. At minimum, Storable proved a good-faith belief in a colorable right to limit access. ..................31

3. Storable's unclean-hands defense bars injunctive relief..........................................................34

C. The Temporary Injunction is a mandatory injunction. ..............34

CONCLUSION ........................................................................36

CERTIFICATE OF COMPLIANCE ................................................37

CERTIFICATE OF SERVICE.......................................................38

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Tex., N.A. v. Gaubert,*
   286 S.W.3d 546 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.) .........................22

*Bennett v. Computer Associates Intern., Inc.,*
   932 S.W.2d 197 (Tex. App.—Amarillo 1996, no writ) ....................................31

*In re Bexar Cnty. Criminal Dist. Attorney's Office,*
   224 S.W.3d 182 (Tex. 2007) ............................................................................14

*Burrow v. Arce,*
   997 S.W.2d 229 (Tex. 1999) .............................................................................29

*Butnaru v. Ford Motor Co.,*
   84 S.W.3d 198 (Tex. 2002).................................................................................17

*Cameron Intern. Corp. v. Guillory,*
   445 S.W.3d 840 (Tex. App.—Houston [1st Dist.] 2014, no pet.).....................23

*CMH Homes v. Perez,*
   340 S.W.3d 444 (Tex. 2011) .............................................................................13

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,*
   136 S.W.3d 227 (Tex. 2004) .............................................................................29

*Coca-Cola Co. v. Harmar Bottling Co.,*
   218 S.W.3d 671 (Tex. 2006) .............................................................................24

*DeVillbiss v. West,*
   600 S.W.2d 767 (Tex. 1980) .............................................................................21

*Florie v. Reinhart,*
   No. 01-16-00603-CV, 2017 WL 817166 (Tex. App.—Houston [1st Dist.]
   Mar. 2, 2017, no pet.)...............................................................................19, 20

*Graham Cent. Station, Inc. v. Pena,*
   442 S.W.3d 261 (Tex. 2014) .............................................................................32

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc.
   No. 70,*
   415 U.S. 423 (1974)..........................................................................................10

*Guajardo v. Neece,*
   758 S.W.2d 696 (Tex. App.—Fort Worth 1988, no writ).................................19

*Harley Channelview Properties, LLC v. Harley Marine Gulf, LLC*,
690 S.W.3d 32 (Tex. 2024)................................................................23

*HouseCanary, Inc. v. Title Source, Inc.*,
622 S.W.3d 254 (Tex. 2021) ............................................................14

*Jelinek v. Casas*,
328 S.W.3d 526 (Tex. 2010) ............................................................20

*Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.*,
No. 13-13-00087-CV, 2013 WL 5305238 (Tex. App.—Corpus Christi–
Edinburg Sept. 19, 2013, pet. denied) ........................................15, 16

*Letson v. Barnes*,
979 S.W.2d 414 (Tex. App.—Amarillo 1998, pet. denied) ..............12

*In re Moore*,
No. 13-21-00004-CV, 2021 WL 717613 (Tex. App.—Corpus Christi–
Edinburg Feb. 24, 2021, no pet.) .....................................................11

*Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*,
29 S.W.3d 74 (Tex. 2000)...........................................................23, 24

*Reach Group, L.L.C. v. Angelina Group*,
173 S.W.3d 834 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ...15

*Rieder v. Woods*,
603 S.W.3d 86 (Tex. 2020)...............................................................27

*RP&R, Inc. v. Territo*,
32 S.W.3d 396 (Tex. App.—Houston [14th Dist.] 2000, no pet.) .....35

*Santos Ltd. v. Gibson*,
No. 14-00-00151-CV, 2000 WL 1588095 (Tex. App.—Houston [14th
Dist.] Oct. 26, 2000, no pet.) ...........................................................13

*Scottsdale Ins. Co. v. Guar. Nat. Companies*,
No. 05-96-00561-CV, 1999 WL 1029930 (Tex. App.—Dallas Nov. 15,
1999, pet. denied)..............................................................................31

*In re Silver*,
540 S.W.3d 530 (Tex. 2018) ............................................................14

*Sun Oil Co. v. Whitaker*,
424 S.W.2d 216 (Tex. 1968) .......................................................21, 22

*In re Team Rocket, L.P.*,
256 S.W.3d 257 (Tex. 2008) ............................................................10

*Tex. Beef Cattle Co. v. Green*,
  921 S.W.2d 203 (Tex. 1996) ................................................................25, 31

*Tex. State Bd. of Educ. v. Guffy*,
  718 S.W.2d 48 (Tex. App.—Dallas 1986, no writ)............................................18

*Tex. State Bd. of Examiners in Optometry v. Carp*,
  162 Tex. 1, 343 S.W.2d 242 (1961) ................................................................12

*Tri-Star Petroleum Co. v. Tipperary Corp.*,
  101 S.W.3d 583 (Tex. App.—El Paso 2003, pet. denied)..................................34

*Truly v. Austin*,
  744 S.W.2d 934 (Tex. 1988) ................................................................33

*Veterinary Specialists of N. Tex., PLLC v. King*,
  No. 05-21- 00325-CV, 2022 WL 406095 (Tex. App.—Dallas Feb. 9, 2022,
  no pet.) ................................................................14

*Yilmaz v. McGregor*,
  265 S.W.3d 631 (Tex. App.—Houston [1st Dist.] 2008, pet. denied),
  abrogated by *Zanchi v. Lane*, 408 S.W.3d 373 (Tex. 2013)................................6

**Statutes**

28 U.S. CODE §1446 ................................................................3

TEX. CIV. PRAC. & REM. CODE §51.014(a)(4) ................................................................11

TEX. GOV'T CODE §25A.006................................................................*passim*

**Rules**

TEX. R. CIV. P. 94................................................................21, 22

**Other Authorities**

H.B. 19, 88th R.S., House Committee Report,
  *https://capitol.texas.gov/tlodocs/88R/billtext/pdf/HB00019H.pdf#navpanes=0*................................................................4

House Journal at 2571,
  https://journals.house.texas.gov/hjrnl/88r/pdf/88RDAY52FINAL.PDF#page=104................................................................4

## SUMMARY OF ARGUMENT

On December 30, 2024, SafeLease filed suit in Travis County District Court and obtained a temporary restraining order at 10:25 am on New Year's Eve without a hearing. SafeLease chose the date to file and the district court forum even though its Original Petition undisputedly asserted claims within the jurisdiction of the business court. It pled Storable violated the Texas Free Enterprise and Antitrust Act of the Business & Commerce Code and attempted monopolization. CR45, 50, Petition ¶85, 102. Seven weeks earlier, SafeLease's CEO accused Storable in writing of acting with intent to deprive the market of a low-cost competitor and tie products to the disadvantage of competitors. DC8RR375; Appellants' Br. at 17-24.

SafeLease knew before filing suit that the business court had jurisdiction.

After the district court denied SafeLease's request for a temporary injunction, it belatedly removed the case to the business court in violation of the removal statute and Texas's rules against forum shopping. SafeLease's position is squarely refuted by the legislature's pre-enactment removal from the bill of text that would have supported its position. And its arguments ignore the statutory text, common-law rules against forum-shopping, and the damage that their strategy wreaks on judicial efficiency and reputation.

SafeLease then convinced the business court to grant the Injunction without providing sufficient evidence.

Of note, both the district court and the business court squarely rejected injunctive relief on the monopolization and antitrust claims, leaving only the tenuous tortious-interference-with-contract claim as the basis for the business court's temporary injunction. *See* Appellants' Br. 12 and Appx. 10 (showing the paragraphs stricken in SafeLease's proposed temporary injunction asserting antitrust violations as a basis for the relief.) Thus, Storable objects to all of the antitrust bases argued in Appellee's brief to uphold the Injunction.

Substantively, SafeLease failed to evince sufficient evidence of the necessary elements to support the injunction, including because there is no evidence of imminent and irreparable harm but only assertions of quantifiable monetary damages.

These failings require dissolving the Temporary Injunction and remanding to the district court.

# ARGUMENT

## I. SafeLease Untimely Removed To The Business Court.

### A. *SafeLease's "plain language" argument rewrites the statutory text.*

The removal statute mandates that a notice of removal to a Texas Business Court must be filed:

> not later than the 30th day after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action.

25A.006(f)(1). SafeLease argues that this language "must be construed as starting the removal clock when a plaintiff files its original petition in district court." Resp. 31. But nothing in the statutory text says that. The text does not mention the filing of a petition, or any limitation on starting the clock when jurisdictional facts should have been discovered.

This contrasts with the federal removal statute, which states that the clock starts upon "the initial pleading." 28 U.S. CODE §1446. SafeLease argues that Texas Business Court removal "borrows from parallel federal rules," Resp. 41, which means that the Texas Legislature considered relying on the petition date like the federal rule but chose not to. The bill that created the removal deadline originally started the clock on "the date the party was served with the initial pleading," the trigger date SafeLease advocates; however, the legislature chose to remove that language from the statute. *See*

-3-

H.B. 19, 88th R.S., House Committee Report, *https://capitol.texas.gov/tlodocs/88R/billtext/pdf/HB00019H.pdf#navpanes=0* (pre-enactment version of bill basing clock on pleading date); May 1, 2023 House Journal at 2571, https://journals.house.texas.gov/hjrnl/88r/pdf/88RDAY52FINAL.PDF#page=104 (deleting language that based clock on pleading date). The text is unambiguous and it is determinative.

## B. *A plaintiff discovered before filing its petition "facts establishing the business court's jurisdiction over the action."*

The clock for removal begins when a plaintiff should have discovered "facts establishing the business court's jurisdiction over the action." 25A.006(f)(1). SafeLease argues that such discovery cannot occur before the filing of a petition because an action does not exist until the filing of the petition. Resp. 32–36. That argument fails because the triggering discovery is of "facts," not the filing of an action.

SafeLease's argument also conflicts with other uses of "action" within the removal statute. "An **action** within the jurisdiction of the business court **may be filed** in the business court," §25A.006(a). SafeLease attempts to differentiate "an action" from "the action" by arguing that the former always

-4-

refers to the time before a petition has been filed. Resp. 35. However, that distinction is inconsistent with the rest of the removal statute.

The removal statute uses "an action" several times to refer to a stage *after* a petition has been filed:

> "A party to **an action filed** in a district court or county court at law that **is within the jurisdiction** of the business court may remove the action to the business court."

§25A.006(d) (emphasis added); *id.*(k) ("The judge of a court in which **an action is filed** may request the presiding judge for the court's administrative region to transfer") (emphasis added). Conversely, the removal statute sometimes uses "the action" to refer to times *before* the filing of a petition, such as by stating: "Venue may be established as provided by law or, if a written contract specifies a county as venue for **the action**, as provided by the contract." *Id.*(a) (emphasis added). This type of contractual choice of venue occurs before the petition is filed. Therefore, the removal statute's reference to discovery of facts establishing jurisdiction over "the action" does not indicate that the discovery must occur before the filing of the petition.

Relatedly, SafeLease argues that the removal statute's use of the words "party" and "action" show that an action cannot be removed before the filing

of a petition. Resp. 32–33. That statement is entirely true but also entirely irrelevant.

The fact that the removal right cannot be *exercised* until after the filing of the petition does not mean that the clock for this option cannot begin before the petition. This will not lead to unfairness. The removal clock does not begin until discovery by "the party requesting removal of the action," §25A.006(f)(1), so a plaintiff's early knowledge cannot make a defendant late. Indeed, the legislature provided an incentive appropriately to file in the Business Court, and not forum shop; and it is fair for plaintiffs to lose the right to removal if they intentionally delay.

Nothing in the removal statute's text ties the clock to the commencement of an action. In contrast, in the *Yilmaz* case on which SafeLease relies, Resp. 32, a different statute explicitly tied the clock to "the date the original petition was filed." *Yilmaz v. McGregor*, 265 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2008, pet. denied), abrogated by *Zanchi v. Lane*, 408 S.W.3d 373 (Tex. 2013).

## C. *SafeLease's policy arguments ignore the option it had to initially file in the business court.*

Plaintiffs have two options for reaching the business court: (1) file initially in a business court, or (2) if they discover jurisdictional facts after

filing, promptly remove. §25A.006(a), (f). SafeLease's policy arguments rely on ignoring the first option.

First, SafeLease suggests that starting the clock from when SafeLease learned of the relevant facts would cause injustice by preventing SafeLease from removing "any time after SafeLease filed its original petition." Resp. 42. This seemingly is a tacit admission that SafeLease knew it could have filed its petition in the business court. Its choice not to is a strategy not an injustice.

Second, SafeLease argues that starting the clock with the plaintiff's knowledge would cause "a race to the courthouse." Resp. 42. This argument assumes that plaintiffs will fear losing their right to remove and therefore rush to file their petition. But, besides allowing improper forum shopping, the right to remove is not valuable to plaintiffs who already know they can file initially in the business court.

Third, SafeLease raises "the Legislature's intent" that business disputes be tried in the business court. Resp. 37–38. However, it is a fallacy to suggest that part of the legislature's intent was to sanction forum shopping. Plaintiffs and defendants create the risk of missing the removal deadline when they intentionally and strategically delay.

Fourth, SafeLease argues that it might be difficult for courts to determine when a party discovered jurisdictional facts. Resp. 39–41. But that is the test the legislature mandated by choosing the language "discovered." §25A.006(f)(1). In this case, that determination is easy because SafeLease's petition alleges facts showing SafeLease's early discovery of jurisdictional facts. Appellants' Br. 17–25.

Additionally, SafeLease's interpretation may also require fact-findings. SafeLease admits that "parties may realize that their dispute meets the amount-in-controversy requirement only after filing," Resp. 33, in which case the court would need to engage in the same fact-finding regardless of pre-petition discovery.

## D. *SafeLease engaged in impermissible forum shopping.*

SafeLease does not deny that it knew it could initially file in the business court but strategically chose to first file in the district court to see if the district-court judge would be receptive to SafeLease. Instead, SafeLease proposes flawed reasons for why this strategy should be permitted.

First, SafeLease boldly argues that forum shopping is not prohibited in the text of the removal statute. Resp. 43. However, the text of the statute does limit forum shopping by limiting removal to 30 days from discovery of jurisdictional facts. Unbounded forum shopping would only be permitted if

SafeLease can add words to the statute to stall that clock. And the prohibition on forum shopping is a common-law rule not a statutory prohibition nor is it precluded by statute. Appellants' Br. 33–35.

Second, SafeLease incorrectly argues that the removal statute explicitly condones forum shopping by permitting removal after a district court denies a temporary injunction. Resp. 43–44. However, the statutory text SafeLease relies on only applies "if an application for temporary injunction **is pending** on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action." §25A.006(f)(2) (emphasis added). This prevents SafeLease's strategy because a party that knows jurisdictional facts before asking the district court for a temporary injunction does not qualify as discovering jurisdictional facts while the temporary injunction "is pending."

Third, SafeLease argues that its strategy does not inject inefficiency into the judicial process because temporary injunctions can be challenged through interlocutory appeal. Resp. 45. However, it is more inefficient to require *two* trial courts to decide the temporary injunction on top of requiring an interlocutory appeal. SafeLease also argues that shopping for judges is not inefficient because judges always have the power to revisit their

interlocutory rulings, Resp. 46–47, but educating a second judge is inherently less efficient.

Fourth, SafeLease argues that its strategy does not endanger the appearance of judicial integrity because federal courts are permitted to dissolve temporary injunctions that state courts granted before removal. Resp. 44. But the one case SafeLease relies on for that point—*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423 (1974)—was not about forum shopping the same temporary injunction. *Granny* dealt with the issue of whether a federal statute stating that state-court temporary injunctions remain "in full force and effect after removal" requires federal courts to "give injunctions or other orders **greater** effect after removal to federal court than they would have had if the case had remained in state court." *Id.* at 428–29, 435–436 (emphasis added).

SafeLease also argues that allowing strategic delay is "applying the law correctly" and thus shows impartiality. Resp. 46. This circular argument is based on the false premise that the law permits SafeLease's strategy. This argument also incorrectly assumes that no strategy that complies with statutory rules can create the impression of impartiality. *See, e.g. In re Team Rocket, L.P.*, 256 S.W.3d 257, 260 (Tex. 2008) (preventing forum shopping even though rules for nonsuiting did not prohibit the strategic nonsuiting).

"[F]orum shopping engenders an appearance of bias and impairs the appearance of judicial neutrality and integrity." *In re Moore*, No. 13-21-00004-CV, 2021 WL 717613, at *11 (Tex. App.—Corpus Christi–Edinburg Feb. 24, 2021, no pet.). Allowing plaintiffs to purposefully try out a district-court judge, knowing they will switch to a business-court judge if they don't like the district-court judge's rulings, inevitably impairs the appearance of judicial neutrality.

## II. This Court Has Jurisdiction To Review Whether The Business Court Should Have Remanded Before Granting The Temporary Injunction.

SafeLease argues that this Court lacks jurisdiction to reach the Remand Denial. However, two sufficient bases for jurisdiction are described below.

### A. *Authority for an interlocutory appeal of the Temporary Injunction encompasses review of the Remand Denial.*

The statutory authority for an interlocutory appeal of the Injunction extends to all issues that affect the validity of the Injunction. This includes the issue of whether the business court erred in granting the Injunction because the business court should have first remanded the entire case.

The legislature authorized interlocutory appeal of an order that "grants or refuses a temporary injunction." TEX. CIV. PRAC. & REM. CODE §51.014(a)(4). In this case, the business court signed an order granting a temporary injunction. 1SuppCR40–48. Storable's notice of appeal

-11-

challenged both the Injunction and the denial of the remand that should have prevented the Injunction. CR971.

When discussing the Temporary Injunction, SafeLease stated: "this Court plainly possesses appellate jurisdiction over that order. SafeLease has never questioned that." Motion to Strike Appellants' Supplemental Brief 7–8 (citation omitted). And the law provides, as SafeLease admits, that authorization for an interlocutory appeal encompasses all issues that could "affect the validity" of the appealable order. Resp. 27; *see also Tex. State Bd. of Examiners in Optometry v. Carp*, 162 Tex. 1, 2, 343 S.W.2d 242, 243 (1961). For example, in *Letson v. Barnes*, 979 S.W.2d 414, 417 (Tex. App.—Amarillo 1998, pet. denied), a party filed an interlocutory appeal challenging a civil court's temporary injunction preventing enforcement of a penal statute. *Id.* In addition to challenging the temporary injunction itself, the appellant challenged the authority of the civil court to decide penal-code matters. *Id.* The court of appeals held that "even though that topic is not within those enumerated under section 51.014," that issue can be decided in the interlocutory appeal because "if the court has no authority to act, it can hardly be said that the court's action is valid." *Id.*

In this case, the business court did not validly[1] grant the Temporary Injunction because this case was not removed to the business court within the statutory deadline. Appellants' Br. 16–33.

## B. *In the alternative, this Court can treat this appeal as a request for mandamus relief.*

The Supplement to Appellants' Brief, and Appellants' Response to Motion to Strike, explain why this Court can and should treat this interlocutory appeal as a mandamus proceeding to the extent necessary to address an issue. In short, the Texas Supreme Court instructs courts to accept that efficient vehicle for reaching the merits. *CMH Homes v. Perez*, 340 S.W.3d 444, 453–454 (Tex. 2011).

The Supplement also establishes the elements required for mandamus relief—no adequate remedy by appeal and clear abuse of discretion. Supp. 2–5. SafeLease does not dispute Storable would lack an adequate remedy by appeal if it cannot address the Remand Denial in an interlocutory appeal.

---

[1] The Response's arguments about whether the removal deadline is jurisdictional are red herrings. At minimum, the deadline is mandatory because the notice of removal "must" be filed by that deadline. §25A.006(f). The validity of the Temporary Injunction is affected by whether SafeLease obtained the Temporary Injunction by improperly forum shopping and ignoring a mandatory statutory deadline. *Cf. Santos Ltd. v. Gibson*, No. 14-00-00151-CV, 2000 WL 1588095, at *2–3 (Tex. App.—Houston [14th Dist.] Oct. 26, 2000, no pet.) (reaching denial of a motion to strike, which is not covered by the interlocutory-appeal statute, because it affected the validity of an order denying a special appearance, which is covered by the statute).

For the second mandamus element, SafeLease argues that a court cannot clearly abuse its discretion on an unsettled issue of law. Resp. 26. However, that position has consistently been refuted expressly by the Texas Supreme Court. "Even where the law is unsettled or the issue is one of first impression, a court may abuse its discretion if its legal decision is incorrect." *In re Silver*, 540 S.W.3d 530, 538 (Tex. 2018); *see also In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 185 (Tex. 2007); *HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 259 (Tex. 2021).

## III. SafeLease Failed To Establish The Requirements For A Temporary Injunction.

### A. *SafeLease failed to show an injury that is probable, imminent, and irreparable.*

#### 1. SafeLease provided no evidence that it could not avoid the alleged injuries by incurring the cost for an API agreement.

"If an injury is compensable by money damages, it is, by definition, not irreparable." *Veterinary Specialists of N. Tex., PLLC v. King*, No. 05-21-00325-CV, 2022 WL 406095, at *5 (Tex. App.—Dallas Feb. 9, 2022, no pet.). SafeLease's CEO testified that SafeLease likely would have reached a deal to access Storable's FMS through an API agreement if the price was lower. 5BCRR93–94; 2DCRR173. SafeLease's Response argues that SafeLease should not have to pay for API access, Resp. 71, but SafeLease does not deny

that any improper payment for API access can be compensated with money damages.

SafeLease does not identify evidence that the potential injuries described in SafeLease's Response could not be avoided by paying for API access. SafeLease cites to testimony about injuries that could occur "without FMS access." Resp. 73 (citing 5BCRR15). But purchasing API service would have provided SafeLease with access to Storable's FMS. 2DCRR128 (Storable's CEO testifying "if a business wants to access our systems for the purpose of running their business, then they need to sign an API agreement").

In addition, testimony that SafeLease might go out of business if it had to pay API fees is mere speculation[2] and therefore cannot support the Temporary Injunction. *See Reach Group, L.L.C. v. Angelina Group*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding testimony that potential loss of clients created "great risk" was insufficient to support a temporary injunction). SafeLease did not attempt to distinguish Storable's on-point citation to *Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.*, No. 13-13-00087-CV, 2013 WL 5305238 (Tex. App.—

---

[2] This speculation is also contradicted by the evidence of SafeLease's financial resources and profit margins. Appellants' Br. 47–48.

Corpus Christi–Edinburg Sept. 19, 2013, pet. denied). In *Legacy*, the temporary injunction could not be supported by a business owner's testimony that without a temporary injunction, he would be "driven out of business" and be unable to pay for overhead. *Id.* at *6–7.

### 2. SafeLease provided no evidence that any irreparable harm was imminent.

Appellants' Brief demonstrated that SafeLease had the obligation to, but did not, provide evidence that irreparable harms were imminent. Br. 47–49. This alone is fatal to the Injunction.

SafeLease's Response contains no argument for why any irreparable harms were imminent. Even if SafeLease's mention of bankruptcy could be construed as argument about imminence, SafeLease cites only two pieces of bankruptcy evidence, neither of which indicate imminence. First, SafeLease cites testimony that if SafeLease had to pay API fees, SafeLease might "go out of business." Resp. 76–77 (misquoting BC4RR248). This does not mention a time-fame and is no evidence that SafeLease would go out of business before it could obtain a final judgment. Second, SafeLease cites testimony that loss of customers was a "ticking time bomb." Resp. 77 (citing BC3RR324; BC4RR16). This testimony provided no indication of when the "bomb" would detonate; to the contrary, the witness stated he expected the risk to "continue on today and into the foreseeable future." BC4RR16.

Storable provided evidence that while negotiating over the price of API access, SafeLease stated that it had good credit[3] and offered to acquire some of Storable's business for more than 100 times as much as the alleged cost of paying the demanded API price through to a final judgment. BC5RR99–101; BC7RR2160–61; BC5RR167.

SafeLease did not provide evidence that SafeLease lacks the resources to pay for API access until a final judgment. Instead, SafeLease points to testimony from its CEO that "I think in general, the liquidity question, yeah, we've got – we've got enough for probably a couple of months of payroll." Resp. 78 (citing BC5RR128). However, SafeLease provided no evidence of the dollar amount of a month of payroll, how many months is "a couple," and how that compared to the amount required to access API or hire help from facility operators until a final judgment. Nor did SafeLease provide evidence that it could not obtain sufficient credit.

### 3. SafeLease does not deny that it can track lost customers and revenue.

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204

---

[3] SafeLease argues that Storable did not raise this evidence about credit in the business court. Resp. 77. That is incorrect. *See, e.g.*, CR270.

(Tex. 2002). Appellants' Brief explained that SafeLease "can track which customers it loses due to the alleged wrongdoing, and calculate how much revenue SafeLease lost from those customers." Br. 46. SafeLease does not deny this. Resp. 75. SafeLease's Chief Revenue Officer testified that SafeLease has a "tracking mechanism" enabling SafeLease to identify which customers cancelled because of the "dispute between SafeLease and Storable," 3BCRR321–324, and that for each customer SafeLease will know "moving forward, how much to expect revenue SafeLease would not be recognizing because of this cancellation." BC4RR80–81.

SafeLease argues that it will suffer general reputational harm "because of Defendants' false claims." Resp. 75. However, the Injunction does not prevent Storable from making claims about SafeLease; it orders only that Storable provide FMS access. 1SuppCR40–48. Therefore, SafeLease does not address its burden to provide "[e]vidence that, **without a temporary injunction**, the applicant will suffer irreparable injury." *Tex. State Bd. of Educ. v. Guffy*, 718 S.W.2d 48, 49 (Tex. App.—Dallas 1986, no writ) (emphasis added).

### 4. The business court's findings are unsupported by evidence.

SafeLease quotes the findings in the Temporary Injunction as if they themselves are evidence. Resp. 67–70. However, "[t]he trial court's findings

of fact are reviewable for legal and factual sufficiency of the evidence to support them." *Guajardo v. Neece*, 758 S.W.2d 696, 698 (Tex. App.—Fort Worth 1988, no writ). The sections above explain why there is no evidence of the elements for a temporary injunction. Below is additional analysis of the lack of support for the business court's findings.

SafeLease argues the findings are supported by testimony that it will be difficult for SafeLease to provide its insurance services without access to Storable's FMS. Resp. 69. However, this testimony does not indicate that SafeLease cannot get access to Storable's FMS by paying for API access, or compensate for lack of direct FMS access by coordinating with facility operators who have such access. BC5RR18–20, 24; Appellants' Br. 40–47 (describing evidence that SafeLease can provide its insurance services through an API, hiring additional staff, or coordinating with facility operators).

Testimony that claims-adjustment has "slowed" because SafeLease must coordinate with facility operators who have direct FMS access, BC5RR24, is not evidence of *irreparable* harm. Nor is testimony that "some folks have indicated they're going to look elsewhere," BC3RR324, especially because SafeLease admitted it can track the revenue lost from such customers, 4BCRR80–81. SafeLease cites *Florie v. Reinhart*, No. 01-16-

00603-CV, 2017 WL 817166, at *12-13 (Tex. App.—Houston [1st Dist.] Mar. 2, 2017, no pet.), Resp. 68, but that case is inapposite because the harm in *Florie* would be permanent and incalculable—the illegitimate election of a third board director who would unalterably change the company's structure and operations by outvoting the plaintiff director.

SafeLease argues Storable waived objections to "several" unspecified findings in the Temporary Injunction. Resp. 68. However, SafeLease cites no authority requiring a party to object to findings within a temporary injunction before appealing, let alone object to every finding on an individual basis. SafeLease cites *Jelinek v. Casas*, 328 S.W.3d 526, 540 n.10 (Tex. 2010). Resp. 68. But the cited footnote in *Jelinek* holds only that an appellate court cannot grant relief that was not requested and briefed. *Id.* In fact, *Jelinek* undermines SafeLease by holding that courts should not defer to unsupported findings and that unsupported opinions should be disregarded "regardless of whether there is no objection." *Id.* at 536, 538.

If Storable was required to object to findings, it did so in its motion to reconsider the Injunction. CR956–959.

## B. *SafeLease failed to show a probable right to recover for tortious interference.*

The Injunction is based on a probable right to recover on only one claim—"tortious interference with valid, existing SafeLease contracts."

1Supp.CR41. SafeLease failed to establish a probable right to recover on that claim because that claim is barred by Storable's justification defense.

### 1. Affirmative defenses are considered when determining probable right to recover.

SafeLease misleadingly cites *DeVillbiss v. West*, 600 S.W.2d 767, 768 (Tex. 1980) for the proposition that "Defenses of avoidance are disregarded when adjudicating temporary injunctive relief." Resp. 50. In reality, *DeVillbiss* held "a trial court is not authorized to determine **the merits** of the plea in bar in a hearing on an application for a temporary injunction." *DeVilbiss*, 600 S.W.2d at 768 (emphasis added). In *DeVillbiss*, during a temporary injunction hearing, the trial court went beyond temporary relief to find that the defendant had proved its defense of res judicata and that the plaintiff's suit should therefore be "dismissed with prejudice." *Id. DeVilbiss* did not say that the defense should be omitted from the analysis for a temporary injunction.

The Texas Supreme Court decided the relevant issue in *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216 (Tex. 1968). In *Sun Oil*, the oil company sought a permanent injunction against the landowner based on a contractual right to use the land. *Id.* The landowner raised the affirmative defense of illegality based on the land use violating a statute. *Id.* at 219; TEX. R. CIV. P. 94 (illegality is an affirmative defense). At the hearing on the temporary

injunction, the parties stipulated that they would not discuss that affirmative defense. *Id.* at 218–219. The trial court granted the temporary injunction without considering that defense. *Id.* at 219. The Texas Supreme Court held that this was error because lack of evidence about an affirmative defense "completely destroyed [the oil company's] ability to show its probable right on final trial to a permanent injunction." *Id.* at 219.[4] "The basic issue to be tried is the probable right of the applicant to a permanent injunction when *all* defenses made by the pleadings are considered." *Id.* Similarly, when addressing a temporary injunction in *Bank of Tex., N.A. v. Gaubert*, 286 S.W.3d 546 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.), the court examined "a probable right to relief on his claims in light of the statute of frauds defense," which is an affirmative defense. *Id.* at 552; TEX. R. CIV. P. 94.

SafeLease is not only incorrect about the binding case law but also about the principles behind temporary injunctions. SafeLease argues that affirmative defenses should be omitted from the temporary-injunction analysis because such defenses defeat the merits of a claim and determine "the plaintiff's ultimate right to recover." Resp. 49. But that is precisely what

---

[4]     SafeLease cites to intermediate court of appeals cases. Resp. 50. Those cases do not override the Texas Supreme Court, so this Reply will not address them except to say that those cases rely on the prohibition of deciding the merits in a temporary-injunction context, which is not Storable's position.

SafeLease had the burden to show—"a probable right to recover on that claim after a trial on the merits." *Harley Channelview Properties, LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024). "[C]onsidering the propriety of temporary injunctive relief … entails a thorough review of the law applicable to the parties' claims **and defenses**." *Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (emphasis added).

### 2. Storable's justification defense bars SafeLease's right to recovery.

#### a. Charging for access to property and enforcing contracts are not "tortious in themselves."

SafeLease argues that this case is like *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 81–83 (Tex. 2000), which held actions that "falsely and maliciously disparage" are not protected by the justification defense because those acts are "tortious in themselves." However, the claims in SafeLease's petition do not allege any disparagement. CR306–338. Therefore, SafeLease cannot use evidence of disparagement to establish a probable right to recover on its pled claims. Resp. 53.

In addition, SafeLease does not cite evidence of disparagement, or explain how Storable made false statements "knowing its charges are baseless," which is a required element of that tort. *Prudential*, 29 S.W.3d at 82. "Companies should be able to communicate frankly about disputes

-23-

without fear of a claim by third parties for tortious interference." *Id.* The supposedly false statements were that SafeLease's method of access caused security issues and violated the Terms of Use, Resp. 17, which are statements that Storable believed (and continues to believe) are true based on the evidence. *See infra* Sections III.B.2.b–e.

SafeLease's petition alleges that Storable tortiously interfered with SafeLease's agreements with facility operators by asking SafeLease to pay for access to software that Storable owns and enforcing Storable's Terms of Use. CR306–338. Charging for access to Storable's property and enforcing Storable's contractual rights are not tortious in themselves. "Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Prudential*, 29 S.W.3d at 81.

SafeLease argues that "anticompetitive" conduct could count as tortious in itself. Resp. 53. SafeLease pled one anticompetitive tort, attempted monopolization of the tenant-insurance market, but did not provide evidence supporting all of that tort's elements, which are "1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671,

690 (Tex. 2006).[5] And the business court did not consider testimony from SafeLease's antitrust expert, Dr. Williams, because "the TI Order does not rely on SafeLease's antitrust claim." 1Supp.CR52.

SafeLease's arguments assume that an exercise of a contractual right is "tortious" if its goal is to harm SafeLease. There is no evidence that was Storable's goal, but that issue is moot because if "the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense … and the motivation behind assertion of that right is irrelevant," even if the defendant acted with "actual malice." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211-212 (Tex. 1996).

### b. The Terms of Use justify interfering with third parties profiting from Storable's FMS.

SafeLease does not dispute that Storable owns its FMS and that ownership includes the right to control access to the FMS. Instead, SafeLease argues that the Terms of Use limit that right and that Storable's choice to exclude SafeLease exceeded that contractual limit. Resp. 56. This

---

[5] SafeLease suggested that including noncompete clauses in Storable's API agreements is inherently improper and monopolistic. *See, e.g.*, 5RR202-205; CR636. However, SafeLease's counsel contradicted that position by explaining in an article that noncompete agreements can be pro-competitive and that "courts have generally assessed noncompete agreements under the rule of reason, rather than as per se unlawful." Bryce Callahan and Kay Dannenmaier, *Can Noncompete Agreements Be Antitrust Heroes?*, THE TEXAS LAWBOOOK, August 21, 2025.

misinterprets the Terms of Use, conflates breach of contract with tortious interference, and ignores Storable's contractual right to further limit access at its discretion "at any time." BC7RR1264; BC7RR1281.

The Terms of Use require any "third party" to sign a data exchange agreement such as an API agreement. BC7RR1279 ¶4.5. SafeLease admitted that it is not a party to the Terms of Use, BC5RR70, which means that SafeLease is a "third party." SafeLease also admits that it has always operated without a data exchange agreement. Resp. 56. SafeLease argues that it had "no technical need" for a data exchange agreement, but SafeLease identifies no language in the Terms of Use that exempts vendors who do not have a technical need. There is no such exception because data exchange agreements provide security and stability benefits *to Storable. See* Appellants' Br. 4.

The Terms of Use also give Storable the contractual right to prevent vendors like SafeLease from "commercially exploit[ing]" Storable's FMS or using Storable's FMS for any purpose besides "solely for [the facility operator's] internal business purposes." BC7RR1278 ¶4.1, 4.3(ii). SafeLease interprets this language as allowing vendors to use Storable's FMS to directly profit from payments made by a facility's tenants so long as the facility shares in those profits. Resp. 59. That conflicts with language in the

Terms of Use, such as the word "solely." SafeLease suggests that this issue should be decided based on "evidence," Resp. 58, but this issue hinges on contract construction, which courts review de novo. *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020). There is no fact dispute because SafeLease's CEO admitted that SafeLease generates revenue from tenants' payments for SafeLease's insurance products. BC4RR42–43; BC5RR91.

The Terms of Use also require a separate data-exchange agreement for "any use to develop a commercial product." CR398. SafeLease admits that it "offers its insurance products … by directly accessing storage facilities' management software." Resp. 1. SafeLease also admits that its insurance products are a "commercial product" and that it uses data from Storable's FMS to "visualize to the customer." BC5RR72.[6]

### c. The Terms of Use justify preventing access that interferes with FMS integrity or performance.

The Terms of Use permit Storable to block access that will "interfere with or disrupt the integrity or performance of the [FMS] Services or third-party data contained therein." CR398 ¶4.3(viii).

---

[6] SafeLease's CEO testified that this visualization is "not a commercial product" and that SafeLease is not developing a "commercial product" with FMS information. BC5RR35–36. That is no evidence because it is conclusory and a legal opinion on the meaning of contract language.

Storable proved two types of interference that SafeLease does not attempt to rebut. First, Storable proved that SafeLease's method of access threatened the integrity of the FMS by exposing private identifying information that an API would not have exposed. Appellants' Br. 54–55. SafeLease does not dispute this, let alone provide refuting evidence.[7] Second, Storable proved that SafeLease's method of access interfered with FMS payment functions and ran faulty automated processes. Appellants' Br. 55. Again, SafeLease does not dispute this.

Regarding FMS performance, SafeLease relies on one piece of testimony from its expert. Resp. 57 (citing BC5RR274-276). However, that testimony does not state that SafeLease's method of access does not "interfere" with FMS performance. Instead, this expert testified that Storable could "reduce" (not entirely prevent) interference *if* Storable pays to scale up servers and limits its customers to "slow down the amount of incoming traffic to be to a more manageable level." BC5RR274. The Terms of Use do not state that Storable must accept interference that can be reduced by increasing the cost and reducing the speed of service.

---

[7]     SafeLease does more generally argue that SafeLease has "gold-standard" security protocols for handling client data, Resp. 58, but that does not refute the fact that exposing information to additional parties inherently increases risk.

Storable proved that SafeLease's method of access degraded[8] performance of the FMS, in part by loading visual information that an API would not load. Appellants' Br. 54 (citing BC5RR196; DC2RR127; DC2RR252; BC5RR259). SafeLease cites testimony from its expert that SafeLease's method of access is "[n]ot inherently" worse for performance than API access, but that expert admitted he "didn't quite understand all of the details" of Storable's evidence, did not address evidence showing that SafeLease's method of access loaded extra visual information, and did not identify what he relied on for this opinion. BC5RR275. This kind of "[o]pinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). An "expert's bare opinion [ipse dixit] will not suffice." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

### d. The Terms of Use justify preventing circumvention of security measures.

The Terms of Use permit Storable to block users who "circumvent or disable any security or other technical features or measures of the [FMS]."

---

[8]    SafeLease's arguments about a full "outage" do not address degraded performance. Resp. 57.

BC7RR1278 ¶4.3(iv), (v). Evidence showed that SafeLease's method of logging into accounts designed for use by individual facility operators circumvents the important security measure of identifying malefactors by looking for user behavior that is abnormal for the operator running that facility, such as logging in from a city in which the operator is not located. BC5RR247. SafeLease provided no contrary evidence, and its Response does not address this.

Evidence also showed that SafeLease circumvented Storable's other security measures. *See* Appellants' Br. 58–59 (citing CR335; BC4RR52–57; BC7RR3788; BC5RR13, 110–112, 242, 264). SafeLease does not deny this but rather argues that this circumvention happened "*after* Defendants started interfering with SafeLease's contracts." Resp. 61. However, the evidence shows that SafeLease began this circumvention (including the creation of alternate accounts with non-SafeLease email addresses) in October 2024, in preparation for security initiatives that were not implemented until November. BC4RR52–57; CR25.

In conclusion, the Terms of Use provided numerous grounds for Storable to limit SafeLease's access, which means that blocking access cannot constitute tortious interference.

### e. At minimum, Storable proved a good-faith belief in a colorable right to limit access.

Storable cannot be liable for tortious interference if Storable had "a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Tex. Beef Cattle Co.*, 921 S.W.2d at 211. "A right is colorable if it appears, without further inquiry (i.e., on its face), genuine, truthful, valid, or existing." *Scottsdale Ins. Co. v. Guar. Nat. Companies*, No. 05-96-00561-CV, 1999 WL 1029930, at *9 (Tex. App.—Dallas Nov. 15, 1999, pet. denied). "[O]nce a defendant is found to have asserted a colorable claim in good faith his actual malice became immaterial." *Bennett v. Computer Associates Intern., Inc.*, 932 S.W.2d 197, 202 (Tex. App.—Amarillo 1996, no writ) (internal quotation marks omitted).

The evidence described above shows that Storable at minimum had a colorable property and contract right to limit SafeLease's access to Storable's FMS. SafeLease does nothing to assail that by arguing that the Terms of Use could be interpreted differently and that SafeLease's unwanted use of the FMS was not as bad as it seemed.

SafeLease identifies only one piece of evidence for bad faith— testimony that Storable's CEO did not personally, before rolling out new security initiatives, warn SafeLease or mutual customers that SafeLease was violating the Terms of Use or harming Storable's FMS. BC5RR185–87, 221.

-31-

However, it is at least equally probable that Storable's CEO did not provide early warning because there was no obligation to and he did not want to give a violator more time to prepare to circumvent security measures. Using the lack of early warning as evidence of bad faith "would violate the equal inference rule, under which a factfinder may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 265 (Tex. 2014) (internal citation omitted).

In contrast, Storable provided evidence that made good faith more probable. Testimony from an insurance vendor unaffiliated with Storable stated that this vendor believed "what SafeLease is doing" violates the Terms of Use. BC4RR261. SafeLease's only response is that the vendor's belief "says nothing about Defendants' contractual rights," Resp. 66, but that misses the point because the fact that third parties have the same belief is evidence that Storable's belief was in good faith.

Storable also proved that an unaffiliated FMS provider determined that SafeLease's method of access is improper. This provider explained that insurance vendors should not access the FMS through facility operators' "user accounts" but rather ask the operators to "to send any data or

information needed by said third-party." BC4RR77; BC7RR2686. This indicates that Storable held the same belief in good faith. SafeLease argues that the agreement with that FMS provider is "very different" from the Terms of Use, but SafeLease does not cite to the other agreement or support that assertion. Resp. 66.

Another piece of evidence for good faith is that a June 18, 2024 presentation delivered internally to Storable executives stated that SafeLease's "practices are violating Storable's FMS agreement" and that Storable should limit such "unauthorized users through deployment of enhanced security measures which align with data privacy and protection." DC5RR94 at PX-58; DC2RR100–101. The fact that Storable expressed that position in a document that was not intended for view by outsiders, and that was created six months before litigation commenced, is evidence that Storable had a good-faith belief in that position. SafeLease's only response is to argue that the presentation does not prove Storable in fact had the right to exclude SafeLease, Resp. 64, but that is not an argument against good faith.

In summary, SafeLease provided no evidence probative of bad faith, whereas Storable provided unrebutted, probative evidence of good faith.

### 3. Storable's unclean-hands defense bars injunctive relief.

A party seeking a temporary injunction "must do equity and come to court with clean hands." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). Appellants' Brief explained that SafeLease acted inequitably by basing its entire business model on free access to Storable's property. Br. 62–63. SafeLease does not point to contrary evidence; instead SafeLease points out that the business court did not find any legal authority that free riding defeats the merits of a claim for tortious interference, which is not relevant to an equitable defense against a temporary injunction. Resp. 79; 1SuppCR44.

Storable also showed that SafeLease's removal to the business court was part of an inequitable plan to shop for a more receptive judge. Appellants' Br. 33–40, 63. SafeLease does not deny this.

SafeLease falls back on arguing that Storable did not prove this inequitable conduct "harmed" Storable, but it is self-evident that SafeLease harmed Storable by forcing Storable to provide free services and to litigate in front of multiple judges until SafeLease found a judge that ruled against Storable.

### C. *The Temporary Injunction is a mandatory injunction.*

The Temporary Injunction requires Storable to supply SafeLease with software services. 1SuppCR40–48. SafeLease argues this is like the

temporary injunction in *Tri-Star*. Resp. 82. However, that temporary injunction merely ordered Tri-Star to "relinquish operations and cease acting as Operator of the Comet Ridge Project." *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 586 (Tex. App.—El Paso 2003, pet. denied). The court held this was not a mandatory injunction because if relinquishing operations required some affirmative action to hand off operations, that action would be "incidental" to the prohibition on continuing to act as operator. *Id.* at 592–593. In contrast, the Injunction requires Storable to *continue* operating the FMS and to provide FMS services to SafeLease, which is a substantial affirmative action.

Courts can only grant a mandatory injunction based on "a clear and compelling presentation of extreme necessity or hardship." *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 401 (Tex. App.—Houston [14th Dist.] 2000, no pet.). SafeLease did not provide clear and compelling evidence that having to pay for API access until a final judgment would cause it extreme hardship.[9]

---

[9] SafeLease argues that Storable "waived" this standard by not briefing it to the business court. Resp. 81. However, Storable argued to the business court that it "cannot compel parties to enter into new contractual relationships," CR801, and that SafeLease "can pay the API fee" without going out of business, CR272. Storable also clearly raised the issue that SafeLease provided insufficient evidence to support the Temporary Injunction, which preserves all arguments about that issue.

## CONCLUSION

For these reasons, Storable requests that this court reverse the Remand Denial, dissolve the Temporary Injunction, and order this case remanded to the district court from which it was removed. Storable also prays for such further relief to which it may justly be entitled.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: */s/ Dale Wainwright*
    Dale Wainwright
    State Bar No. 00000049
    Dale.Wainwright@gtlaw.com
    Justin Bernstein
    State Bar No. 24105462
    Justin.Bernstein@gtlaw.com
    300 West 6th Street, Suite 2050
    Austin, Texas 78701
    T: (512) 320-7200
    F: (512) 320-7210

COUNSEL FOR APPELLANTS

**CERTIFICATE OF COMPLIANCE**

This brief complies with the length limitations of TEX. R. APP. P. 9.4(i)(3) because this brief consists of 7,487 words as determined by Microsoft Word Count, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Justin Bernstein*
Justin Bernstein

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on counsel of record by using the Court's electronic system on the 27th day of August 2025, addressed as follows:

STONE HILTON PLLC

Judd E. Stone II
State Bar No. 2407670
judd@stonehilton.com
Christopher D. Hilton
State Bar No. 24087727
600 Congress Ave.,
Austin, Texas 78701
T: (737) 465-7248

YETTER COLEMAN LLP

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
T: (713) 632-8000

LOCKELAW PLLC

Adam Locke
adam@lockelaw.com
2617 Bissonnet, Suite 503
Houston, Texas 77005
T: (713) 832-0242

COUNSEL FOR APPELLEE

*/s/ Dale Wainwright*
Dale Wainwright

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Dale Wainwright
Bar No. 49
sylvia.dominguez@gtlaw.com
Envelope ID: 104944471
Filing Code Description: Other Brief
Filing Description: Appellants Reply Brief
Status as of 8/28/2025 6:54 AM CST

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cathy Hodges | | catherine.hodges@aporter.com | 8/27/2025 8:55:39 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 8/27/2025 8:55:39 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 8/27/2025 8:55:39 PM | SENT |
| Ray Torgerson | | rtorgerson@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Jonna Summers | | jsummers@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Lakshmi Kumar | | lkumar@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |
| Neil KentonAlexander | | kalexander@porterhedges.com | 8/27/2025 8:55:39 PM | SENT |

Associated Case Party: SafeLease Insurance Services, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Yetter Coleman | | efile@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Adam Locke | 24083184 | adam@lockelaw.com | 8/27/2025 8:55:39 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Cody Coll | | cody@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Dale Wainwright
Bar No. 49
sylvia.dominguez@gtlaw.com
Envelope ID: 104944471
Filing Code Description: Other Brief
Filing Description: Appellants Reply Brief
Status as of 8/28/2025 6:54 AM CST

Associated Case Party: SafeLease Insurance Services, LLC

| Alyssa Smith | | asmith@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
|---|---|---|---|---|
| Bonnie Chester | | bonnie@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| R. Paul Yetter | | pyetter@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 8/27/2025 8:55:39 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 8/27/2025 8:55:39 PM | SENT |